# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                  **Case No.  8:13-cr-173-T-33TBM**

**LARRY JOE JACKSON,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court for a Report and Recommendation on **Defendant's Motion to Suppress Illegally Seized Evidence Request for a Franks Evidentiary Hearing** (Doc. 20).  On thorough consideration of the Motion, the government's response, and the applicable law, and with the benefit of an evidentiary hearing, it is recommended that the Motion be denied.

### I.

By his motion, Defendant seeks to suppress all evidence seized in a search of the residence at 2534 9th Avenue E., Bradenton, Florida, on August 23, 2012, particularly that of a shotgun and a 9mm bullet.  Defendant argues that the search warrant authorizing the search was issued on an affidavit that contained material omissions and/or misrepresentations which were recklessly and intentionally misleading to the issuing court.  Additionally, he argues that the fifty-two day delay in seeking the search warrant was unreasonable and the information in the warrant application was stale such that the warrant was invalid.  Defendant also argues

that the warrant application failed to reveal a nexus between the residence and the weapon sought in this search. (Doc. 20).

In opposition, the government maintains there were no material omissions from the warrant application. Although the alleged shooting victim recanted his earlier identification of Defendant and such was omitted from the affidavit, the government argues that the recantation was immaterial because it was not credible. The government also argues there is no indication that the affiants acted knowingly and recklessly in omitting this questionable information as they could not include in the affidavit information that was unknown to them at the time and any negligence on their part does not create a *Franks* violation. Further, the government argues that the warrant was not stale and, at the time the warrant issued, probable cause existed that firearms would be located at the Defendant's residence. (Doc. 24). In these circumstances, the government urges that it was reasonable to presume Defendant would keep his firearm(s) at his residence and the warrant affidavit established a reasonable nexus between the residence and the gun sought. (Doc. 41).

II.

An evidentiary hearing as called for by *Franks v. Delaware*, 438 U.S. 154 (1978), was conducted August 13, 2013. A brief summary of that testimony follows.

Donald Wasden (Wasden) testified that on July 1, 2012, at about 7:30 p.m., as he exited his vehicle and began walking toward his house, he was approached by an individual who pointed a gun at him and shot him. Fortunately, the bullet struck a cell phone and he was not seriously injured. By his account, the shooter left the scene driving a small, black

Volkswagen, Mazda, or Mitsubishi.  He also saw a Suburban[1] and a Crown Victoria. Wasden was not sure what car the shooter left in because there about five other people with the shooter.  He acknowledged that he was "lit" (impaired) and had drank about eight to ten beers prior to the shooting.  Wasden had never before seen the person who shot him.

When the police arrived, Wasden was asked to describe the person.  He indicated a heavy set person between 5 feet 10 inches and 6 feet 2 inches tall.  At about midnight, Wasden was shown two packs of photos and asked if he could identify anyone.  In the second group of photos, he picked out the guy who looked most like the person who shot him and he told the police that.  *See* Gov't Ex. 1a.  He also filled out a statement.  *See* Def. Ex. 5.

About a month later, Wasden came home and found an envelope with a note on the front door.  The note indicated that "Larry Jackson," the person who shot him, was in custody.  The envelope included $40.00 as well.  On August 9, 2012, he went to court for Defendant's first appearance hearing.  Wasden spoke with the judge and advised the judge that Defendant was not the guy who shot him.  Before going to court, Wasden had done a computer search, learned of the hearing date, and saw a "mug shot" of Jackson and realized that was not the guy who shot him.  Wasden claims he went to court voluntarily.  Although, there was money attached to the note, he claims that had nothing to do with his speaking with the judge.  In court, Wasden was given a detective's phone number and told to call him.  Wasden claims he tried to call the detective, but he wasn't persistent and never talked

---

[1]Wasden testified that later that same evening, after the police had arrived, a woman came back in the Suburban and yelled at him.

with the detective. Shortly thereafter, Wasden himself was jailed. When he was sentenced in April 2013, Detective Price came to speak with him. Wasden told Price that Jackson was not the guy who shot him.[2] He is positive that Defendant was not the shooter.

Wasden's sister, April Wasden, was at the home when someone took a shot at her brother.[3] She was a witness to the shooting. When the shot was fired, the police were called by a neighbor and she went to check on her brother. She told an officer she saw a black SUV and black car. She also was shown photos by the police. She could not identify anyone and told the officer that. According to her, the officer then told her to pick out the "closest person," which she did. She indicated, however, that she was not sure. *See* Def's Ex. 3. She believes the shooter went around the car and got into the SUV. She advised another Spanish officer of that information. That officer, identified by Detective Rogers as Officer Espinola, took witness statements at the scene. By his report, April Wasden identified a black Chevy with rims.

Desiree Williams testified that she owned a black Mitsubishi automobile. At pertinent times, Defendant was her boyfriend and he used to stay with her. On the night of the shooting, police came to her home at 2534 9th Avenue E., in Bradenton, and said they were looking for Defendant and a gun. Defendant was not there but she let them look around and she told them that she had loaned the car to Defendant.

---

[2]Wasden is presently serving a state sentence for burglary and other charges.

[3]The witness identified the photograph in Def. Ex. 12 as depicting the area in front of her house where this occurred.

On July 12, 2012, two Manatee County deputies came and searched her residence. Again, the officers said they were looking for "Larry" and a weapon. One officer, Detective Riley, looked throughout the house, moved things about, looked in closets and drawers, and moved her mattress. The search lasted two to three minutes. The witness denied that she told the officers that she and Defendant had broken up.

On August 8, 2012, Detective Riley and a number of other officers came back to her residence looking for Defendant. Williams opened the door and asked if they had a warrant. She was not shown a warrant and was pushed out of the way. Defendant was present and was arrested. Williams also was arrested (for obstructing) and taken from her home. When she later returned home, it was apparent that the place had been searched again, cushions on the couch were out, drawers were open, and the mattress was off the bed. She testified they did not go into her daughter's bedroom. She denied that on this date she saw or knew of a gun in her daughter's room. Williams was not present when the search warrant was executed.

Joseph Rogers, a detective with the Palmetto Police Department (PPD), lead the investigation of Wasden's shooting and was one of the affiants to the disputed search warrant.[4] On July 1, 2012, he arrived at the scene within a couple hours after the shooting. As a consequence of the investigation that evening, Defendant because a suspect because of positive photopack identification and his connection with a black Mitsubishi.[5] By the

---

[4]Rogers claims ten-plus years in law enforcement and two years as a detective.

[5]It appears that an officer had chased this vehicle from the scene and obtained a tag number. The tag was identified as registered to Ms. Williams. Later that evening, Williams confirmed that she had loaned the vehicle to the Defendant.

witness's account, he was only given information about one vehicle, a black Mitsubishi.[6] Wasden took him through a re-enactment of the shooting, during which he found a 9mm bullet fragment. Detective Rogers denied any knowledge of Wasden drinking that evening.

Regarding the photopack identifications, Detective Rogers testified that PPD had a manual instructing officers on how such should be conducted. As part of the department's procedures, PPD officers employ a line-up affidavit with written instructions. *See* Def. Exhs. 1-4. By Detective Rogers' account, before he attempts an identification, he reads the whole of the instructions to the individual he is working with. He followed that procedure in this case. On that evening, two photopacks were put together by another officer. At that time, the detective did not know what Defendant looked like. He testified that he had four "positive" identifications that evening, two of the Defendant and two of a person other than Defendant.

As for Wasden, he was read the department instructions and shown both sets of photos. From the second photopack, he identified Defendant. According to Detective Rogers, Wasden was "certain" of the identification and said so. *See* Def. Ex. 2. Thomas Applegate also selected Defendant's photograph. He claimed to know Defendant from the neighborhood and he also said he was "certain." As for April Wasden and George Wasden, they selected another individual, but both were unsure and said so. *See* Def. Ex. 3 and 4.

_____

[6]Detective Rogers later recalled reading a report in which April Wasden had identified a black Chevy on rims, but he was only concerned with one car that evening, the black Mitsubishi.

Although not introduced into evidence, Detective Rogers was the affiant on applications for two arrest warrants for Defendant issued July 2, 2012. Between that date and the day he was called by a judge, Rogers did not develop any other pertinent information on these crimes.

On August 9, 2012, Detective Rogers received a telephone call from a judge. This was highly unusual. He understood that someone was in court on this case and saying Defendant was not the guy. He understood that "someone" would be calling him. He denies knowing the person before the judge was Donald Wasden. He claims he did not hear Judge Henderson refer to the person as "Don." In any event, the detective did not attempt to contact Wasden after this call, nor did he hear from Wasden. Neither did he hear from anyone at the State Attorney's Office about this phone call. In sum, he did nothing on this case after the judge's call until he received an e-mail from the prosecutor's office on August 20, 2012.

On August 20, 2012, the witness received an e-mail from Assistant State Attorney Brian Iten. *See* Gov't Ex. 3. In pertinent part, the e-mail stated, "[I]t is my hope that if PPD can develop probable cause that [Defendant] lived at 2534 9th Avenue East, Bradenton, PPD . . . can acquire a warrant to search [Defendant's] home for the shooter's firearm and ammunition. Since a firearm is not consumable, we can presume it would remain at a suspect's home for a longer period of time than a consumable item of evidence, such as drugs or money." The e-mail also included some suggested "go-by" language related to this. The detective had no other contact with the prosecutor before the search warrant application.

Regarding the matter of where Defendant lived, Detective Rogers had heard Defendant lived with his girlfriend, but it was only after Defendant's arrest that he confirmed that Defendant lived with Williams. Apart from that, he developed no additional information about Defendant, a firearm, or this residence.

Detective Rogers had a co-affiant on the Affidavit and Application for Search Warrant (application/affidavit) because Williams' residence was in Bradenton. He did not submit the application/affidavit to the prosecutor for review as he did not think that was necessary. He did not include Wasden's statement to Judge Henderson in his affidavit because he did not know it was Wasden in court. Had he, he would have included the statements. In any event, there was another eyewitness and the information from Williams about Defendant having the car that evening. The detective acknowledged that prior to drafting the application/affidavit on August 22, 2012, he had no confidential source of information or information about what was inside the residence at 2534 9th Avenue E. Nor did he have any description of a gun in the residence. The last paragraph in the application/affidavit is the "go-by" language Iten sent him.

The search warrant was signed by a Judge Nicholas on August 22, 2012, and executed the following day. *See* Gov't Ex. 5. On execution of the warrant, police found a 9mm casing in Defendant's bedroom and a shotgun under a mattress of Williams' daughter's bed.

Detective Rogers denied that he spoke with Detective Riley about Defendant's arrest but he may have read Detective Riley's report. Looking at his affidavit, he could not recall how he learned that Defendant's residence had been confirmed by his stepfather,

which was information developed by Detective Riley but not set forth in his report. The witness agreed that the decision to exclude or omit information from an affidavit is an intentional act.

A recording of Defendant's initial appearance hearing before Judge K. Douglas Henderson on August 9, 2012, and a transcript are in evidence. *See* Gov't Ex. 2, 2A. At the outset, Judge Henderson spoke with Defendant and noted the two arrest warrants dated July 2nd on charges of attempted homicide and felon in possession of a firearm. Counsel for Defendant advised the judge that he wished to contest probable cause and that he had a witness present who would say that Defendant was not the man who shot him. Wasden was then sworn in. Wasden told the court that Defendant was not the guy who shot him; the guy who shot him was forty pounds heavier. Wasden stated he himself had just gotten out of jail and that he was voluntarily present because he did not want to see the wrong person go to jail. He denied being threatened and receiving money or being bribed. The judge indicated that he would consider a significantly reduced bond but he also noted that the affidavit stated that another person had identified the Defendant as well. Defendant spoke briefly. He advised the judge that he had lived in the area his whole life and that he was residing with his girlfriend.

Detective Rogers was contacted at his office and spoke with the judge. Judge Henderson inquired who the victim was and noted that there was "a gentleman" in court, under oath, indicating the person he was addressing was not the same person. After pulling up his electronic file, the detective identified the victim as Donald Wasden. He also noted that there were four witnesses, two of whom had picked Defendant out of a photo line-up

immediately following the incident. At that, the court indicated that maybe he should have "Don" go out and meet with the detective in the next couple of days. In response, the detective said "okay" and the call ended. The court addressed bond and told Wasden to see Detective Rogers at PPD.

Jason Riley, a detective with Bradenton police, was involved in the attempt to arrest Defendant on July 12, 2012, at the residence at 2534 9th Ave. E., in Bradenton. He spoke with Williams, who permitted them in to look for the Defendant. He denied searching for, or seeing, a firearm. On August 8, 2012, he returned to the residence along with several officers. They gained entry, found Defendant inside the livingroom, and arrested him on the outstanding warrants. Williams was also arrested and transported away. The house was secured and the officers left. By his account, no search was conducted.[7]

On July 12, 2012, Williams told him she and Defendant had broken up. Thereafter, he was uncertain of Defendant's residence and did some investigation. He claims he checked with the Defendant's step-father and spoke further with neighbors. From that inquiry, he received information that Defendant was at Ms. Williams' residence.

The witness never talked with Detective Rogers about the arrest. His report may have been available.

Brian Iten, a supervisory prosecutor with the State Attorney's Office for the Twelfth Judicial Circuit, testified that on August 20, 2012, he sent an email to Detective

---

[7]Detective Rushing, who was among five or six officers at the scene on August 8, 2012, testified that he covered the rear of the house. At the time he came around to the front of the house, the Defendant and Williams were in custody. He was advised to transport Williams. He was unaware of any search being conducted.

Rogers suggesting some language for a search warrant of Defendant's residence. At that time, the witness had no knowledge that Defendant carried a gun nor knowledge that a gun had been seen inside Williams' residence. He was aware of matters set forth in the arrest affidavits, such as the information about the Mitsubishi and the fact that Defendant lived at the residence on 9th Avenue East. He believed that, under Florida law, they could presume a gun was in the Defendant's residence because it was not a consumable or perishable item. His proffered language was to address this nexus and staleness. By his account, Ms. Brinkley, the prosecutor handling Defendant's case, had spoken with him that day. She claimed she was overwhelmed with work and in need of his help getting a search warrant. He testified further that, on or about this date, Brinkley requested that subpoenas be issued for ten witnesses to appear for a pre-filing interview in Defendant's case. Iten agreed to handle that as well.

Sometime between August 21, 2012, and September 4, 2012, when he conducted the witness interviews, Iten reviewed a memo dated August 20, 2012, regarding the identification issue. According to the witness, another prosecutor, Ashley Dusnik, was present at the Defendant's initial appearance and thereafter related Wasden's recant of his identification of Defendant in this memo to Ms. Brinkley.[8] According to Iten, this was his first indication of any problem with the identification by Wasden. Iten claims this memo was not in the case file when he first reviewed the file; nor was he aware of its contents when he emailed Detective Rogers about the search warrant. According to Iten, apart from

_____

[8]Iten believes this memo had been sent to Brinkley and she placed it in the file but took no action on it.

his email, he had no other contact with Detective Rogers until after he began pre-filing interviews on September 4, 2012, which was well after the warrant had issued and been executed.[9]

Greg Price, a detective with the Bradenton police, was the co-affiant on the search warrant. He played no part in the investigation and only reviewed the affidavit to confirm probable cause. He denied knowledge of any of the circumstances surrounding Wasden's appearance before the judge until he met with the federal government this year. He offered that if a judge had called him like this, it would have raised a "red flag" and he might have gone to see the judge and tried to speak with the witness involved.

III.

A.

By his primary argument, Defendant raises a Fourth Amendment violation under *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the

---

[9]Ultimately, as a consequence of a statements taken at the pre-filing interview which were different than those reported by the police, the decision was made not to prosecute Defendant. *See* Def. Ex. 7.

> search warrant must be voided and the fruits of the search
> excluded to the same extent as if probable cause was
> lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155-56. Under *Franks*, a defendant must carry his burden of proving that (1) the affiant knowingly or recklessly made the alleged misrepresentations and/or omissions,[10] and (2) excluding the alleged misrepresentations and/or including the alleged omissions would preclude a finding of probable cause for issuance of the warrant, i.e., the misrepresentations and/or omissions were material. *United States v. Novation*, 271 F. 3d 968, 987 (11th Cir. 2001)*; United States v. Jenkins*, 901 F. 2d 1075, 1080 (11th Cir. 1990).

Here, Defendant complains that the search warrant application/affidavit contained material misrepresentations and omitted certain material facts and that such misrepresentations and omissions were intentional or made with reckless disregard for the truth. "When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading." *United States v. Kapordelis*, 569 F. 3d 1291, 1309 (11th Cir. 2009) (citing *Franks*, 438 U.S. at 171-72). "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause. Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause." *Id.* (quotations omitted).

---

[10]Negligent or innocent mistakes are insufficient to establish a *Franks* violation. *Franks*, 438 U.S. at 171.

Defendant raises two challenges in this regard. First, Defendant urges that material misrepresentations and omissions were made concerning the eyewitness evidence connecting Defendant to the shooting. In particular, he contests the following language in the application/affidavit:

> Affiant showed four witnesses a photo line-up, consisting of six photographs, one of which was Larry Jackson. Two of the witnesses were not able to make positive identification. In fact they selected a suspect similar in appearance to Jackson. However, the victim and another witness made positive identification of Larry Jackson.

Gov't Ex. 4 at 2. He argues that the language is misleading as evidenced by the PPD line-up affidavits, which indicated there were four positive identifications made that evening but only two were of Defendant. He also argues that the language omits any reference to the fact that Wasden, the alleged victim, recanted his identification of Defendant just thirteen days prior to the search warrant being sought.

Next, Defendant complains that the affiants failed to inform the judge that the residence at 2534 9th Avenue East had been searched on July 12, 2012, and again on August 8, 2012, and no firearm had been located.[11]

_____

[11]At the hearing, Defendant also argued that the affiants failed to inform the judge of two other material facts: (1) that Wasden was intoxicated on the evening he made his identification; and (2) that witnesses identified another vehicle, an SUV, as involved in the shooting, and April Wasden said that she saw the shooter get into an SUV and not a black Mitsubishi. I find that neither of these purported omissions was material to the probable cause determination in this case. Although Wasden claimed he was drinking that evening and neither Detective Rogers nor Wasden's sister recognized or reported that he was, the fact that Wasden was drinking as claimed would not have defeated the probable cause determination. And, even assuming Defendant left in an SUV rather than a black Mitsubishi, the information obtained about the Mitsubishi suggested it was at the scene of the shooting and provided a strong link to Defendant.

While I agree that the language quoted above from the affidavit could have been articulated more clearly with respect to the four eyewitness identifications and the language appears deliberately chosen by affiants to strengthen the identification, in and of itself the language is not so misleading as to call the probable cause determination into question. Defendant's argument here, that the affidavit was misleading as to the identifications by April and George Wasden, is largely one of semantics. Thus, while Detective Rogers checked on his PPD line-up affidavits for April and George Wasden that each had made a positive identification, neither made a positive identification of Defendant. While I can agree that the more accurate statement would have been that these two witnesses made a positive, albeit qualified, identification of a person other than Defendant, the same is otherwise suggested by the affiants' statements that the witnesses "selected a suspect similar in appearance to Jackson." Thus, even if this language is somewhat misleading as worded, the purported misrepresentations cannot meet the materiality standard under *Franks*.

More troubling, however, is the purported misrepresentation that the victim made a positive identification of Defendant. Given the fact that Wasden recanted his identification shortly before the search warrant was sought, that statement does not provide a complete picture of Wasden's identification of Defendant. Indeed, the application/affidavit is devoid of any information concerning Wasden's appearance before Judge Henderson and his statement to the judge that Defendant was not the guy who shot him. On the available record, Detective Rogers was surely negligent, and perhaps even reckless, in failing to conduct any follow-up investigation and in failing to report highly relevant identification

information to the judge reviewing the warrant application/affidavit. Detective Rogers was the lead investigator on this shooting. Eyewitnesses had identified two different individuals as the shooter. While the detective may have concluded that Defendant was the shooter, he was on notice after the judge telephoned him and expressed concern that the victim of the shooting was in his court, under oath, declaring that Defendant was not the shooter. Despite the evident concern of the judge, Detective Rogers chose to do nothing to investigate the matter further. In these circumstances, his claim that he did not know that the "Don" referred to by Judge Henderson was the victim appears fatuous. In short, his ignorance of the truth appears the deliberate by-product of his failure to follow-up on the judge's call with his eyewitnesses, any other witness, or the prosecutor. Nonetheless, I conclude that even if such reflects Detective Rogers' reckless disregard for the truth in contemplation of *Franks*, the omission is not so material that it would have altered the probable cause determination.

As urged by the government and set forth in the affidavit, there still was another eyewitness who made an unqualified identification of Defendant as the shooter. While Wasden's recant of his identification would no doubt give the judge pause, the additional information provided in the application/affidavit about Defendant's possession of the black Mitsubishi seen fleeing the scene of the shooting and his residing at Williams' home provided a reasonable and significant circumstantial link between the Defendant and this crime even in the face of Wasden's recant of his identification. In these circumstances, I conclude that even with this omitted information, a judge could find a reasonable basis to

believe Defendant was the shooter and that a search warrant should issue. In sum, the omission here does not satisfy the materiality standard under *Franks*.

As for the second alleged omission from the application/affidavit, i.e., that the residence at 2534 9th Avenue East had been searched on July 12, 2012, and again on August 8, 2012, and no firearm had been located, Defendant urges that Detective Rogers had knowledge of these searches by Detective Riley and of the fact that no firearm had been discovered in the residence, and, thus, that information should have been included in the application/affidavit. Defendant urges that Detective Rogers' testimony that he never spoke to Detective Riley about his efforts to arrest Defendant at this residence and the lack of firearms within the residence is untrue and belied by representations he made in the affidavit related to Defendant residing at this residence, as confirmed to Detective Riley by Defendant's step-father. Had affiants included this information about the prior searches, he urges there would have been no basis to conclude the weapon would be located at this residence, and, thus, no finding of probable cause and no search warrant.

On this claim, despite concerns raised at the hearing with Detective Rogers' testimony that he did not speak with Detective Riley concerning his arrest of Defendant and his vagueness about his source of information that Defendant resided at this residence, I conclude there is an insufficient showing that affiants made an intentional or reckless misrepresentation or omission concerning any prior searches of the residence. Over and above the doubts raised by the fact that Detective Riley denied that he or any officer assisting him actually searched the residence for evidence on either July 12, 2012, or August 8, 2012, there is simply insufficient proof to conclude that affiants were aware of

any prior search for weapons at this residence at the time they authored this application/affidavit. The testimony that Detectives Rogers and Riley never spoke about Detective Riley's efforts to arrest Defendant at this residence is uncontradicted. While Defendant challenges the veracity of this testimony and illustrates from the application/affidavit that Detective Rogers included information about this being Defendant's residence that would have come from Detective Riley, that alone does not reflect that Detective Rogers had knowledge that Detective Riley or his fellow officers had searched the residence for weapons and found none. Here, it is not challenged that Defendant lived at the residence. And, by Detective Riley's account, no such information about a search for weapons could have been given to Detective Rogers since no search was performed. In short, there is no evidence to support a finding that such facts existed within the knowledge of the affiants and that they deliberately concealed them. Absent a showing of such an omission and proof that it was intentionally or recklessly made, there is no *Franks* violation.[12]

### B.

Defendant argues next that, regardless of the *Franks* violation, there was not probable cause to support the search because the application/affidavit was the product of

_____

[12]Had this omission been established as a factual matter and consistent with *Franks*, the omission would have been material to the matter of probable cause and nexus. Here, Detective Rogers relied on boilerplate language concerning firearms and the likelihood that such would be found inside the owner's residence or car to establish probable cause for the search. Had the judge been advised that just two weeks before the warrant was sought, a search of the residence had turned up no firearm or ammunition, I do not believe a search warrant could have issued under this application/affidavit.

unreasonable delay and failed to establish a nexus between his residence and the evidence sought by the warrant. Regarding the delay, Defendant urges that the affiants waited an unreasonable period of time in seeking the warrant - fifty-two days after the shooting, and such is contrary to the requirement that "[t]he information in the affidavit must also be fresh." *United States v. Martin*, 297 F. 3d 1308, 1314 (citing *United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002)). As for a lack of nexus between the evidence sought by the warrant (a gun) and his residence, Defendant maintains that the affiants did not have reliable evidence to connect a firearm with his residence. *See Martin*, 297 F. 3d at 1314 ("the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.").

These arguments fail as well. As in all such searches, the fundamental question is whether the application/affidavit established probable cause to believe that the items sought by this application/affidavit on August 22, 2012, would be found in this residence when searched. The probable cause standard is not particularly onerous. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that the contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). However, "[i]t is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *Martin*, 297 F. 3d at 1314 (quotation omitted). Moreover, the information supporting probable cause must not be stale.

Here, affiants waited more than fifty days after the shooting to seek a search warrant for guns and ammunition. Despite Defendant's contention to the contrary, I find this delay, in and of itself, no cause to quash this warrant. While it is correct that between the shooting on July 1, 2012, and the issuance of the warrant on August 22, 2012, the affiants did not develop any information to support that a firearm or ammunition would be located at this residence, there otherwise was adequate information in the application/affidavit to support the probable cause determination. Here, to establish probable cause, affiants relied upon the nature of the underlying crimes allegedly committed by Defendant - attempted homicide and felon in possession of a firearm; Defendant's criminal history, which included a prior robbery and aggravated battery; the non-perishable nature of firearms and ammunition; and the opinions that people who own firearms generally keep them in their homes and one seen in possession of a firearm is likely to have that firearm and other firearms in their home. Regarding this latter opinion evidence, the affiants stated:

> [Affiants] have likewise learned that criminals who
> possess firearms store their guns and their ammunition in
> separate locations, which commonly include their homes,
> their vehicles, and their persons. According to [Affiants']
> experience, a criminal who has been observed in
> possession of a single firearm is likely to have that firearm,
> as well as additional firearms, stored in his home and/or
> vehicle. [Affiants] know that evidence sought during the
> course of an investigation can be either consumable or
> non-consumable. Consumable items of evidence, such as
> drugs and currency, are of such nature that investigators
> expect them to remain at a given location for a limited
> amount of time. Non-consumable items, by comparison,
> are more likely to be kept for a long time, especially where
> the non-consumable items are innocuous in and of

> themselves or are not incriminating, such as clothing,
> jewelry, or firearms of the suspect. Similarly, items that
> have continuing utility to a suspect are more likely to be
> kept for a long time.

Gov't Ex. at 2-3. It is this language which the government relies upon to overcome any

staleness or nexus argument. Case law supports the contention. Thus, courts examining

similar circumstances have concluded that people who own guns do generally keep them at

their homes or on their person. *See United States v. Steeves*, 525 F.2d 33, 38 (8th Cir.

1975) (citing *United States v. Rahn*, 511 F.2d 290 (10th Cir. 1975), *Bastida v. Henderson*,

487 F.2d 860 (5th Cir. 1973)); *State v. Weil*, 877 So. 2d 803, 805 (Fla. Dist. Ct. App.

2004)).

In *Steeves,* the Eighth Circuit discussed the lengthy delay in seeking and obtaining

a search warrant, recognizing that in some circumstances, such may invalidate a warrant.

*Steeve*s, 525 F.2d at 37-38. In that case, law enforcement sought a warrant of defendant's

home nearly three months after the robbery of a bank. *Id.* at 38. While no evidence of the

bank robbery was located during the search, two unrelated firearms were seized and formed

the basis for two gun charges. *Id.* Despite the delay in seeking the search warrant, the court

upheld the search on the rationale that it was not unreasonable to believe that a ski mask,

clothing, and a gun used in the bank robbery might still be in the suspect's home. *Id.*

Given that "people who own pistols generally keep them at home or on their person," the

court held that the lapse of time was not so great as to invalidate the warrant. *Id.*

A similar rationale appears applicable in this circuit. In *United States v. Anton*,

546 F.3d 1355 (11th Cir. 2008), the Eleventh Circuit upheld a search of the defendant's

home and the seizure of weapons where the affidavit in support of the search warrant revealed that the defendant, a convicted felon, had been seen in possession of numerous firearms at several gun shows, and that based on the affiant's experience, "convicted felons and firearm dealers possessing contraband typically store these items on their property." *Id.* at 1358. According to the court, "[e]vidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search. *Id.* (citing *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990)). The court also rejected the staleness argument where the search occurred in late 2005, "substantially contemporaneous" with the earlier guns shows at which defendant was seen. *Id.* Finally, the court noted that even if the search warrant lacked probable cause, the defendant could not avoid the good faith exception to the exclusionary rule.

The rationale justifying the search in *Anton* appears applicable here, although it is arguable that a person in Defendant's position would discard his weapon rather than hold on to it in these circumstances. Nonetheless, Defendant was seen in possession of a loaded firearm which likely would be kept at his home. The delay in seeking this search warrant was not so great as to invalidate the warrant given the nature of the items sought. Moreover, in the absence of proof of any *Franks* violation, the good faith exception to the exclusionary rule recognized by *United States v. Leon*, 468 U.S. 897 (1984), would appear applicable even if this Court were to conclude the application/affidavit lacked a showing of probable cause.

IV.

For the foregoing reasons, it is **RECOMMENDED** that **Defendant's Motion to Suppress Illegally Seized Evidence Request for a Franks Evidentiary Hearing** (Doc. 20) be **DENIED**.

Respectfully submitted on this
18th day of October 2013.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
Honorable Virginia M. Hernandez-Covington, U.S. District Judge
Counsel of Record